IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CORNERSTONE ASSURANCE GROUP, INC.,<br><br>Plaintiff,<br><br>v.<br><br>DANIELLE HARRISON,<br><br>Defendant. | Case No. 1:17-cv-04718 |

### DEFENDANT'S MOTION FOR ATTORNEYS' FEES

Danielle Harrison moves this Court for an Order determining that she is entitled to attorneys' fees from Cornerstone Assurance Group, Inc. ("Cornerstone") under three statutory provisions, 765 ILCS 1065/5(i) and FLA. STAT. §§ 607.0850(3) and (9)(c).

### I. INTRODUCTION

On its face, this case resembles many other employment disputes. Employee signs a non-compete contract. The relationship ends. Employer sues. Employer says clients left because of employee's breach of the contract and disclosure of trade secrets. But this case is far different than those where an employer has actual facts, even if loosely tied together, that support plausible legal claims. Here, two quick phone calls by Cornerstone would have stopped any thought of litigation dead in its tracks. In other words, had Cornerstone simply called the two clients it felt Harrison improperly solicited, it would have discovered quickly just how they came to leave Cornerstone for another insurance broker. What's more, the facts Cornerstone left out of the Complaint

1

show just how irresponsible its case against Harrison was. Harrison is entitled to legal fees on three grounds.

*First*, Cornerstone asserted its trade secrets misappropriation claim against Harrison in bad faith. Simply put, Cornerstone made no good-faith effort to determine whether its claims had factual support, revealing that this litigation resembled an abuse of process. *Second*, the Florida Business Corporation Act requires Cornerstone—a Florida corporation—to indemnify Harrison for the legal expenses she incurred in successfully defending herself for an action connected to her employment service. FLA. STAT. § 607.0850(3). And *third*, if the Court finds indemnification is not *required*, Florida statutory law alternatively *permits* the Court to consider "all the relevant circumstances" in determining that Harrison is "fairly and reasonably entitled to indemnification" in this proceeding. FLA. STAT. § 607.0850(9)(c).

## II. PROCEDURAL HISTORY

Cornerstone's lawsuit claims that Harrison breached restrictive covenants in an Employment Agreement and violated the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* ("ITSA"). (Doc. 1). In the Complaint, Cornerstone identified the accounts that it felt Harrison was soliciting improperly as "union clients and their members." (Doc. 1, ¶¶ 40-43). Cornerstone also said that Harrison disclosed trade secrets to "third-parties, including Cornerstone's competitors." (Doc. 1, ¶ 52). In particular, Cornerstone alleged that Harrison supplied her husband, Micah, with trade secrets about clients and that those clients then switched their insurance business to Micah's company, USI Insurance Services, LLC ("USI"). (Doc. 1, ¶¶ 32-37). Cornerstone told the Court that Harrison

2

engaged in this conduct *before and after* Cornerstone terminated her. (Doc. 1, ¶¶ 2, 32, 40, 52).

Harrison moved to dismiss. (Doc. 11). Cornerstone resisted, doubling down on its theory that Harrison disclosed confidential information about union clients and their members to her husband, Micah, so that he could use the information for USI. (Doc. 16, pp. 3-4). After the Court denied Harrison's motion, Harrison answered. (Doc. 20). She then retained new counsel and served her initial disclosures under Federal Rule of Civil Procedure 26(a)(1) the next day. (Ex. 1 (Def's Rule 26(a)(1) Initial Disclosures dated 12/7/17)).

It was just a week later when Cornerstone moved for a voluntary dismissal of the whole case with prejudice. (Doc. 29). Granting the motion, the Court stated that "[i]f either party intends to purse [sic] fees or costs they may motion the Court routinely." (Doc. 37). Harrison has filed this motion within the 14-day period required by Federal Rule of Civil Procedure 54(d)(2)(B)(i).

III. **RELEVANT EVIDENCE**

This case involves insurance brokerage services provided to two local unions in North Platte, Nebraska. Around ten years ago, Micah Harrison (Danielle's husband) sold a disability insurance policy to two local chapters of the Brotherhood of Locomotive Engineers and Trainmen ("BLET"). (Ex. 2 (Decl. of W. Elliott), ¶¶ 4-5; Ex. 3 (Decl. of M. Harrison), ¶¶ 4-6). This benefit is vital to railroad workers—the BLET's members earn their keep on the Union Pacific Railroad—because they protect those workers' incomes if they become disabled. (Ex. 2, ¶ 5; Ex. 4 (Decl. of T. Kuenning), ¶ 6).

Micah knew the leaders of the Local 88 and Local 388, Bill Elliott and Travis Kuenning respectively, and helped their members obtain this disability policy. (Ex. 2, ¶¶ 5-6; Ex. 3, ¶¶ 6-7; Ex. 4, ¶¶ 5-6). It was the first of its kind within the Local 88 and 388 districts. (Ex. 2, ¶ 6). Around 2013, Micah spoke with a Cornerstone principal named Ed Haley. (Ex. 3, ¶ 8). Micah learned Cornerstone was offering a comparable disability plan to the *entire* Union Pacific Railway. (Ex. 3, ¶ 9). Though Micah could not partner with Cornerstone to split commissions, he understood Cornerstone was offering a good disability insurance product for the entire BLET union. (Ex. 3, ¶ 10). He also focused on selling other types of insurance and was aware the BLET's National Committee likely would switch to Cornerstone. (Ex. 3, ¶ 10).

When Cornerstone ran into some resistance with the Local 88 and Local 388, Micah paved the way for Cornerstone and assured the BLET officers that Cornerstone was delivering a good product at rates better than those Micah's company could obtain. (Ex. 2, ¶ 12; Ex. 4, ¶ 9). It was at this point that Cornerstone hired Danielle Harrison. (Ex. 2, ¶ 13; Ex. 5 (Decl. of D. Harrison), ¶¶ 3-4). Danielle's job with Cornerstone was to help enroll union members into insurance plans that Cornerstone offered. (Ex. 5, ¶ 4). Danielle continued this work through the end of 2016 and, during this time, was not responsible for soliciting new union client work for Cornerstone. (Ex. 5, ¶ 10-11).

Things started to go awry for Cornerstone in late 2016 when it experienced substantial rate increases. (Ex. 2, ¶ 8; Ex. 4, ¶¶ 13, 15; Ex. 5, ¶ 13). Danielle made presentations to the Local 88 and 388 on behalf of Cornerstone, but faced push-back from both chapters because of the high rates. (Ex. 5, ¶¶ 13-16). In the face of these rate

4

increases and pressure from their BLET members, both Elliott and Kuenning started to shop the insurance business around to get the Local 88 and Local 388 a better deal. (Ex. 2, ¶¶ 11-12; Ex. 4, ¶¶ 14-16; Ex. 5, ¶ 16). Danielle never encouraged either of them to look to Micah for a better option. (Ex. 2, ¶ 15; Ex. 4, ¶ 20). Naturally, though, both did in fact turn to Micah, who had sold them their original disability policy for BLET members and then facilitated a smooth transition a few years later to Cornerstone. (Ex. 2, ¶¶ 13-16; Ex. 4, ¶¶ 16-19). Micah even suggested to Kuenning in late 2016 that the Local 388 *stay with Cornerstone* until the contract was up. (Ex. 4, ¶ 19).

But both BLET chapters needed to do what was best for their members. Elliott and Kuenning sent Micah a member age census (basically, a client list), data indispensable to Micah for developing proposals. (Ex. 2, ¶ 17; Ex. 3, ¶¶ 17-21; Ex. 4, ¶ 21). The e-mails Micah received from both Elliott and Kuenning confirm they sent him the union member information needed to quote business, and that Danielle had nothing to do with it. (Ex. 3, ¶¶ 17-39 (and referenced Exhibits A-E)). Because Elliott and Kuenning sought Micah out, Micah did not rely on Danielle for any union member information or assistance when quoting them new disability policies. (Ex. 3, ¶¶ 16, 41-43, 47).

Both Elliott and Kuenning corroborate this and have testified that Danielle did not encourage either the Local 88 or Local 388 to switch insurance brokers from Cornerstone to Micah's company, USI. (Ex. 2, ¶ 18; Ex. 4, ¶ 20). Their decisions were based entirely on Cornerstone's "through the roof" rate increases, the direction they received from BLET members to obtain more affordable insurance quotes, and their prior relationship with Micah. (Ex. 2, ¶¶ 14-21; Ex. 4, ¶¶ 15-23). Cornerstone never

5

sought to contact either Elliott or Kuenning to find out why Cornerstone lost the business to Micah's company. (Ex. 2, ¶ 23; Ex. 4, ¶ 25). It simply sued Danielle.

IV. **ARGUMENT**

**A. Because Cornerstone initiated its trade secrets claim against Danielle in bad faith, she is entitled to her fees as the prevailing party.**

Section 5(i) of the ITSA allows a prevailing party to recover attorneys' fees if "a claim of misappropriation is made in bad faith." 765 ILCS 1065/5(i). A claim is "made in bad faith when it is initiated in bad faith, maintained in bad faith, or both." *Tradesman Int'l, Inc. v. Black*, 724 F.3d 1004, 1016 (7th Cir. 2013).

**1. Danielle is a "prevailing party."**

Danielle first must establish that she is a "prevailing party." 765 ILCS 1065/5(i). This action terminated after Cornerstone moved for a voluntary dismissal with prejudice. (Docs. 29, 37). Entry of a with-prejudice dismissal order, even when a plaintiff seeks such an order voluntarily, renders the defendant a "prevailing party." *Riviera Distributors, Inc. v. Jones*, 517 F.3d 926, 928 (7th Cir. 2008) (holding dismissal under Federal Rule of Civil Procedure 41(a)(2) makes defendant the prevailing party).

**2. The ITSA's standard for determining bad faith.**

Danielle next turns to the appropriate bad-faith standard. In *Conxall Corp. v. iCONN Systems, LLC*, 2016 IL App (1st) 140158, ¶ 99, the Appellate Court of Illinois held that "bad faith" in an ITSA action hinges on "(1) whether the pleadings, motions and other papers which were filed by the party violated [Supreme Court Rule] 137 or (2) whether the party's other conduct during the course of the litigation ran afoul of the underlying

6

purpose of Rule 137, which is 'to prevent abuse of the judicial process by penalizing claimants who bring vexatious and harassing actions' or violated other court rules." *Conxall* makes clear that though Rule 137 guides the bad-faith test, that test is not "coterminous" with Rule 137 alone. *Id.*[1]

Illinois Supreme Court Rule 137 is the state-law version of Federal Rule of Civil Procedure 11. *Burda v. M. Ecker Co.*, 2 F.3d 769, 772 (7th Cir. 1993). By its plain terms, Rule 137 prohibits the filing of pleadings or motions that are not "well grounded in fact." ILL. S. CT. R. 137(a). Similarly, Rule 11 states that "factual contentions" must have "evidentiary support" or "likely will have evidentiary support after a reasonable opportunity for further investigation or discovery." FED. R. CIV. P. 11(b)(3).

### 3. Cornerstone had no evidence on which to sue Danielle for trade secrets theft.

Danielle argues that Cornerstone began this action in bad faith not because the law fails to recognize the substantive claims in the Complaint; rather, she does so because Cornerstone never conducted even a rudimentary investigation that would lend those claims some evidentiary support.

Because the bad-faith test hinges on a Rule 11-type analysis, it is appropriate to consider a plaintiff's duty to investigate. On that score, a failure to investigate the basis for a claim brings Rule 11 directly "into play." *Shrock v. Altru Nurses Registry*, 810 F.2d 658, 661 (7th Cir. 1987). As the Seventh Circuit has stated, it "is not permissible to file suit and use discovery as the sole means of finding out whether you have a case.

---

[1] To determine the majority opinion as to the appropriate bad-faith test, the Court must examine Justice Rochford's and Justice Hoffman's opinions. *Conxall*, 2016 IL App (1st) 140158, ¶¶ 99, 108.

7

Discovery fills in the details, but you must have the outline of a claim at the beginning." *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1083 (7th Cir. 1987).

Applying these principles, Cornerstone had a duty to conduct a reasonable inquiry to determine whether Danielle funneled the Local 88 and Local 388 work to Micah or provided him trade secrets about those clients. That inquiry extended to calling Elliott and Kuenning, an obvious precursor to sue. Put another way, it was unreasonable for Cornerstone simply to assume that the Local 88 and Local 388 left Cornerstone because Danielle did something improper as its employee. *See Autotech Corp. v. NSD Corp.*, 125 F.R.D. 464, 470 (N.D. Ill. 1989) (noting party should corroborate its beliefs "by interviewing available witnesses and reviewing accessible documents."). Cornerstone's failure to investigate its claims by contacting Elliott or Kuenning rises to the level of bad faith for three reasons.

*First*, Cornerstone knew that Micah had a prior relationship both with the Local 88 and Local 388. (Ex. 2, ¶¶ 8-10). To be sure, Micah helped Cornerstone solidify the Local 88 and Local 388 business, information casually omitted from the Complaint. (Ex. 2, ¶ 12; Ex. 4, ¶ 9). This fact, surely known to Cornerstone at the inception of this suit, should have led Cornerstone to avoid assuming that Micah resumed working with those clients just because Danielle somehow acted improperly and violated a duty of loyalty. Put differently, when Cornerstone sued, it was plausible (if not extremely likely) that the clients sought Micah out to get competitive quotes. The marital relationship between Micah and Danielle did not provide Cornerstone with grounds to

8

run into court. If Cornerstone was so worried that Danielle was married to someone who was in the same line of work, it never should have hired her.

*Second*, Cornerstone was aware it had experienced substantial rate increases for its disability benefits work. It must have known, then, that clients like Elliott and Kuenning may have been seeking competitive quotes from other entities when they switched to USI. The clients' decisions here to move the business away from Cornerstone was foreseeable. Local 88 and 388 sought out Micah; they did not owe Cornerstone blind fealty. Cornerstone used the veneer of a lawsuit, with no evidentiary basis, to blame Danielle for client attrition she never caused.

*Third*, nothing suggests Cornerstone needed to invoke legal process to discover relevant facts. Instead, it had a *simple* way to find out whether Danielle acted improperly. Cornerstone could have called Elliott and Kuenning and asked them what occurred with the loss of business. But it failed to do so. (Ex. 2, ¶ 23; Ex. 4, ¶ 25). Haley (of Cornerstone) even told Elliott that the Local 88 could not "go through Micah for disability insurance" because of Danielle's Employment Agreement. (Ex. 1, ¶ 22). If anything, that admission proves an anticompetitive intent. Cornerstone, it appears, was more interested in deploying non-sensical threats to retain customers artificially than in finding out just why the clients left in the first instance.

This is a case about Cornerstone turning a blind eye away from the most plausible scenario known to it: rate increases caused clients to seek Micah out for help. The factual allegations against her stemmed from a non-existent investigation, a host of illogical assumptions, and ignorance of relevant facts about Micah's prior involvement

9

with the Local 88 and Local 388. Put another way, this case was almost painfully easy to avoid. But now Danielle and Micah Harrison have incurred nearly $45,000 in legal fees to extricate themselves from a suit that Cornerstone never should have filed. The Court should thus determine that Cornerstone acted in bad faith in initiating its trade secrets claims against Danielle.

> **B. Because Danielle was successful in defending an action brought "by reason of" her Cornerstone employment, Cornerstone must indemnify her from legal expenses under Section 607.0850(3) of the Florida Business Corporation Act.**

Cornerstone is a Florida corporation. (Doc. 1, ¶ 4). The Florida Business Corporation Act ("FBCA") "regulates the structure and activity of Florida corporations." *Banco Industrial De Venezuela C.A., Miami Agency v. De Saad*, 68 So.3d 895, 898 (Fla. 2011). The Court thus must examine the FBCA to determine what indemnification obligations Cornerstone may have to Danielle.

> **1. Harrison was "successful on the merits or otherwise" in defending Cornerstone's action against her.**

Section 607.0850(3) of the FBCA entitles Danielle to receive her legal fees for the *successful* defense of all claims in the Complaint. That provision says:

> To the extent that a director, officer, employee, or agent of a corporation has been *successful on the merits or otherwise* in defense of any proceeding referred to in subsection (1) or subsection (2), or in defense of any claim, issue or matter therein, he or she shall be indemnified against expenses actually and reasonably incurred by him or her in connection therewith.

FLA. STAT. § 607.0850(3) (emphasis added). The FBCA defines the term "expenses" to include "counsel fees." FLA. STAT. § 607.0850(11)(b).

10

The referenced phrase "subsection (1) or subsection (2)" in the quoted indemnification provision identifies different classes of indemnifiable claims. Subsection (1) concerns third-party actions, while subsection (2) covers actions like this case, ones pursued "by or in the right of the corporation to procure a judgment in its favor by reason of the fact that the person is or was a director, officer, employee, or agent of the corporation…" FLA. STAT. § 607.0850(2).

Although subsections (1) and (2) confer only permissive indemnity rights that Cornerstone may extend, subsection (3) is *mandatory*. That is, the Court needs only to evaluate whether Danielle was "successful on the merits or otherwise." Danielle succeeded in defending Cornerstone's claims because she obtained a with-prejudice dismissal of the action. It would be incongruous to find that Danielle is the "prevailing party"—a finding mandated by *Riviera Distributors*—but not "successful" in her defense of this lawsuit. *See Wisener v. Air Express Int'l Corp.*, 583 F.2d 579, 583 (2d Cir. 1978) (holding corporate officer was entitled to mandatory indemnification because he achieved success "on the merits or otherwise" when a case was terminated by mutual consent and "never proceeded to trial.").

### 2. Cornerstone brought this action "by reason of the fact" Danielle was its employee.

The claims Cornerstone asserted against Danielle are indemnifiable under Section 607.0850(3). That is, the alleged wrongdoing arose *because of* her service to Cornerstone and *during* her employment with Cornerstone. (Doc. 1, ¶¶ 29-30, 49-50). The Supreme Court of Florida has avoided interpreting the "by reason of the fact" language pertinent

to the Section 607.0850(3) inquiry. In *Banco Industrial*, the Court held that a corporate officer was not entitled to indemnification under Section 607.0850(3) after she pleaded guilty to a money structuring crime but was acquitted of related money laundering and conspiracy charges. *Banco Industrial*, 68 So.3d at 896-97. The Court rejected the officer's indemnity claim, stating that "she was prosecuted for her conduct, not on account of her position." *Id.* at 900. The Court said nothing else about how to interpret the statute.

Of course, the facts of *Banco Industrial* could not be more different from those here. Danielle did not act "contrary to corporate policy," criminally, or in bad faith, factors indispensable to the holding in *Banco Industrial*. *Id.* Instead, Cornerstone's contract and statutory claims, both linked inextricably with trade secret disclosure, arose because of Danielle's position as a Cornerstone employee and as an extension of her day-to-day employment. (Doc. 1, ¶¶ 2, 32, 40, 52). To be sure, Cornerstone sued Danielle on account of her employment status and her relationship to Micah, not for conduct incidentally related to her job duties that resulted in trade secret disclosure. No fact even suggests she engaged in conduct that arose from her employment, but which was barred by a common-law duty, a contractual provision, or some corporate policy.

Courts interpreting similar state laws have found that an agent's alleged misuse of trade secret information falls within the same "by reason of the fact" language in the FBCA. *See James River Mgmt. Co., Inc. v. Kehoe*, 674 F. Supp. 2d 745, 751 (E.D. Va. 2009) (involving claims for breach of fiduciary duty and trade secret misappropriation; noting officer "allegedly used his 'entrusted corporate powers' to form the knowledge and expertise required to assemble a competing company. He then allegedly organized the

12

appropriation of [plaintiff]'s trade secrets and lured key personnel away from James River."); *Brown v. LiveOps, Inc.* 903 A.2d 324, 328-30 (Del. Ch. 2006) (holding advancement of legal expenses required after corporation sued co-founder for trade secret misappropriation related to his formation of a competing business). Consistent with these authoritative decisions, the Seventh Circuit has found that Delaware's "by reason of the fact" language "is broad enough to encompass suits against a director in his official capacity as well as suits against a director that arise more tangentially from his role, position, or status as a director." *Heffernan v. Pacific Dunlop GNB Corp.*, 965 F.2d 369, 375 (7th Cir. 1992).

The facts of this action present a far more compelling case for indemnification than *James River* and *Brown*. The claimed wrongdoing occurred *before* Danielle was fired on the erroneous assumption that she engaged in misconduct, as an employee, for her spouse's benefit. (Ex. 5, ¶¶ 21-27). Cornerstone's allegations of improper pre-termination activity echo those cases involving a breach of the duty of loyalty, a pleading distinction that is immaterial for indemnity purposes. *See Pontone v. Milso Industries Corp.*, 100 A.3d 1023, 1052-54 (Del. Ch. 2014) (stating substance of allegations, rather than label of claim, matters for "by reason of the fact" analysis). And to that end, claims where the underlying conduct involves a breach of the duty of loyalty provide the causal nexus needed to vest an employee's mandatory indemnification rights. *See Waskel v. Guaranty Nat. Corp.*, 23 P.3d 1214, 1220 (Colo. Ct. App. 2000) (finding former officers and employees satisfied "by reason of the fact" standard when they defended claims for breach of fiduciary duty by former employer).

13

### C. The Court, alternatively, should determine that the relevant circumstances warrant indemnification under Section 607.0850(9)(c) of the FBCA.

The FBCA also enables the Court to grant Danielle indemnification if it determines that she is "fairly and reasonably entitled to indemnification…of expenses…in view of all the relevant evidence, regardless of whether [Danielle] met the standard of conduct set forth" in subsections (1), (2), and (7) of Section 607.0850. FLA. STAT. § 607.0850(9)(c). Subsections (1) and (2) contain the "by reason of the fact" requirement previously discussed, while subsection (7) outlines conduct standards inapplicable here.

So even if the Court found that Danielle were not entitled to indemnification through subsection (3), the Court still may make her whole for defending this action. The same reasons that support an award of attorneys' fees under other statutory provisions merit such a discretionary award. Cornerstone lodged indiscriminate allegations of trade secret theft against Danielle without ever trying to determine whether those allegations had some plausible basis. This is a serious matter.

Trade secrets theft is a crime. *See* 18 U.S.C. § 1832(a) (allowing imprisonment for trade secrets theft for up to 10 years). Danielle's name is now linked forever—through just a basic PACER search—with a workplace felony. That most assuredly functions like a Scarlet Letter, particularly in an era when access to information is beyond prevalent and employers are increasingly careful about whom they hire. After defeating a baseless prosecution, former Secretary of Labor Raymond Donovan famously asked: "Which office do I go to to get my reputation back?" Robert D. Behn, *Rethinking Democratic Accountability*, at 5 (Brookings Institution 2001). Harrison knows where: here.

That this case dithered away quietly provides her only a modest degree of solace. Section 607.0850 of the FBCA applies, even if infrequently, "in a case such as this one where a corporation has sued its own agent." *Turkey Creek Master Owners Ass'n, Inc. v. Hope*, 766 So.2d 1245, 1247 (Fla. Dist. Ct. App. 2000). In fact, if there is any case when it *should* apply with full force, this is the one. Danielle cares more about her reputation than Cornerstone does about instituting a baseless lawsuit. The Court should award Danielle fees because, given the evidence provided, she is "fairly and reasonably entitled" to be made whole in this proceeding. FLA. STAT. § 607.0850(9)(c).

**D. Danielle has provided a fair estimate of the legal fees she has incurred.**

Federal Rule of Civil Procedure 54(d)(2)(iii) requires Danielle to "state the amount sought or provide a fair estimate" of her attorneys' fees. FED. R. CIV. P. 54(d)(2)(B)(iii). As the attached Declaration confirms, the fees and costs Danielle incurred in this action, exclusive of fees arising after this motion, amount to $43,539.90. (Ex. 6 (Decl. of K. Vanko), ¶ 6). Because Danielle is entitled to indemnification under Section 607.0850(3), the Court should include fees "incurred in seeking court-ordered indemnification." FLA. STAT. 607.0850(9)(a). If the Court grants Danielle's motion, then under Local Rule 54.3, the parties must meet and confer over the proper amount of fees. *Rohr-Gurnee Motors, Inc. v. Patterson*, No. 03 C 2493, 2004 WL 422525, at *1 (N.D. Ill. Feb. 9, 2004).

**V.    CONCLUSION**

For the reasons stated, Danielle Harrison requests an Order determining that she is entitled to her attorneys' fees in this action.

Dated:  May 16, 2018

                                              Respectfully submitted,

                                              DANIELLE HARRISON

                                  By:    */s/ Kenneth J. Vanko*
                                              Attorney for Danielle Harrison

Kenneth J. Vanko
Clingen Callow & McLean, LLC
2300 Cabot Drive, Suite 500
Lisle, Illinois 60532
(630) 871-2600
vanko@ccmlawyer.com

## CERTIFICATE OF SERVICE

I certify that on May 16, 2018, I caused *Defendant's Motion for Attorneys' Fees* to be served on the following counsel via e-mail:

>Patrick Edward Deady (ped@hmbr.com)
>John Michael Tecson (mt@hmbr.com)
>Nicholas Mark Hudalla (NH@hmbr.com)
>Matthew James Cleveland (mjc@hmbr.com)
>Hogan Marren Babbo & Rose, Ltd.
>321 N. Clark St., Suite 1301
>Chicago, Illinois 60654

>>/s/ *Kenneth J. Vanko*
>>Attorney for Danielle Harrison